FIRST NAT. BANK OF WALNUT SPRINGS v. FARMERS' & MERCHANTS' STATE BANK OF BALLINGER.†

(Court of Civil Appeals of Texas. Austin. March 20, 1912. Rehearing Denied April 24, 1912.)

BANKS AND BANKING (§ 147*)—DEPOSITS—PAYMENT OF FORGED DRAFT—RIGHTS AS BETWEEN BANKS.

The Merchants' Bank was informed by a depositor having a checking account that in his absence he might want to overdraw his account, and in his absence the cashier was called by telephone by a person purporting to be the depositor and thereafter notified its correspondent bank by telegram, which, on delivery, was erroneously signed "Mechanic's" Bank, that it would pay the depositor's check for $200, with the telegram attached, and the correspondent paid that amount on a forged draft on the "Mechanic's" Bank, and the Merchants' Bank, before discovering the forgery, remitted and charged the amount to the depositor. Held, that, although the remitting bank was negligent in not ascertaining the forgery before remitting to its correspondent, such negligence resulted in no injury to the correspondent, and that the remitting bank could recover.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 438–454; Dec. Dig. § 147.*]

Appeal from Runnels County Court; R. S. Griggs, Judge.

Action by the Farmers' & Merchants' State Bank of Ballinger, Tex., against the First National Bank of Walnut Springs, Tex., and W. T. Nichols. Judgment for defendant Nichols and for plaintiff against defendant First National Bank of Walnut Springs, Tex., and it appeals. Affirmed.

Harris & Harris and Cureton & Cureton, for appellant. Stone & Wade, for appellee.

KEY, C. J. This case originated in a justice of the peace court, but was finally tried in the county court. The suit was brought by the Farmers' & Merchants' State Bank or Ballinger, and the First National Bank of Walnut Springs and W. T. Nichols were made defendants. There was a nonjury trial, which resulted in a judgment for the defendant Nichols, and a judgment for the plaintiff against the First National Bank of Walnut Springs, and that defendant has appealed.

Briefly stated, the material facts are as follows: The plaintiff bank had a customer and depositor with an active checking account, whose name was W. T. Nichols. The plaintiff's cashier in charge of its business was well acquainted with W. T. Nichols and with his signature. A short time before the transaction here involved, W. T. Nichols informed the plaintiff's cashier that he was going away for the purpose of buying cattle, and that he might want to overdraw his account. On December 18, 1909, the plaintiff's cashier was called over the long-distance telephone by some one at Walnut Springs, a distance by telephone of over 200 miles from Ballinger. The testimony of the cashier shows that the person communicating with him purported to be W. T. Nichols, but he stated that it was difficult for him to hear, and that he could not tell from what he heard over the telephone, whether it was Mr. Nichols' voice or not. In fact, he said that some of the conversation was repeated by an operator. As a result of that conversation, the plaintiff bank, acting through its cashier, sent a telegram dated Ballinger, Tex., December 18, 1909, addressed to the First National Bank, Walnut Springs, Tex., and reading: "Will pay W. T. Nichols' check two hundred dollars this attached. Farmers' & Merchants' State Bank." A mistake was made in transmission, and, when the message was received, it purported to be signed "Farmers' & Mechanics' State Bank." After receiving that message, the First National Bank of Walnut Springs cashed a draft which read as follows: "First National Bank, Walnut Springs, Texas, Dec. 18, 1909. Pay to the order of First National Bank, Walnut Springs, Texas, $200.00, two hundred dollars. To Farmers' & Mechanics' State Bank, Ballinger, Texas. [Signed] W. T. Nichols." On the 23d day of December, 1909, the draft above set out, with the telegram above referred to attached to it, was received by mail by the plaintiff, the Farmers' & Merchants' State Bank of Ballinger, and was on that day paid and the money remitted to a bank at Waco, which had sent the draft to Ballinger for payment. At the trial it was admitted by all the parties that the draft was a forgery, as alleged in plaintiff's petition, and was not signed by W. T. Nichols or his authority. The plaintiff, after paying the draft, charged the $200 it had paid to W. T. Nichols, and did not ascertain that the draft was a forgery until about the 9th of January, 1910. The testimony shows that, if the cashier of the Ballinger Bank had exercised proper care, he could have ascertained that the draft was a forgery before that bank paid it, and that he was guilty of negligence in that respect. No testimony was submitted showing how, why, or under what circumstances the defendant bank acquired and paid for the draft, but it was admitted at the trial that it cashed it and paid for it at the time it was drawn.

---

When the draft was presented to the Ballinger bank for payment, it had stamped on the back of it the following indorsement: "Pay to the order of any bank or banker. All previous indorsements guaranteed. First National Bank of Walnut Springs, Texas. O. B. Chambers, Cashier."

On this state of facts counsel for appellant, the First National Bank of Walnut Springs, contend that, as the plaintiff's cashier was guilty of negligence in not ascertaining that the draft was a forgery before the plaintiff paid it, the plaintiff was not entitled to recover the money which it had paid out, and the defendant had received upon the forged draft. We overrule that contention, and hold the reverse of the proposition asserted. If it were true that cases of this kind should be decided by comparing the diligence and negligence of the two banks, without reference to any other consideration, and if the burden of proof rested upon the plaintiff to show that the defendant bank failed to exercise proper care to have the maker of the draft identified, and not upon the defendant to show that it exercised such care, we might sustain appellant's contention. In early days, and for a long period of time, the doctrine seems to have been that a bank could not recover money paid on a forged instrument purporting to be signed by a customer of the bank. According to Mr. Morse's excellent treatise on Banks and Banking, that doctrine was promulgated in 1762 by Chief Justice Mansfield, who held that it was the duty of a bank to know the signature of its customer, and, if it paid a forged bill or other instrument, it could not recover the money so paid out. For many years that decision was followed in England and by many of the courts of the United States, thus affording a striking illustration of the fact that the shadow of a great name can, for a time, foster and maintain a great error.

But the magic name of Mansfield has not been sufficient to render perpetual the heresy taught by him, as is shown by the following quotation from the text-book just referred to:

"Sec. 464. The Old Rule Unreasonable. The old doctrine was that a bank was bound to know its correspondent's signature. A drawee could not recover money paid upon a forgery of the drawer's name, because, it was said, the drawee was negligent not to know the forgery, and it must bear the consequence of its negligence. This doctrine is fast fading into the misty past, where it belongs. It is almost dead, the funeral notices are ready, and no tears will be shed, for it was founded in misconception of the fundamental principles of law and common sense.

"(1) It is not enough to create legal liability or to give A. a right to acquire or retain the property of B., to show merely that A. has been negligent; if so, property would be changing hands so rapidly that it could not be seen in transit, any more than the spokes of a bicycle. One more element is necessary, namely, that damage to A., being himself innocent in the matter, should naturally and proximately result from B.'s negligence. This principle underlies the whole doctrine of negligence; as many times as there are cases in the books involving the question of liability for negligence, the necessity of both elements has been illustrated and enforced, except in the old forgery cases. They are strangely off the track, for in them it is held that the mere fact that B. was negligent gives A. a right to B.'s property, which A. did not have before the negligence (for no case affirms that the holder of forged paper has any right to demand payment of it until it is accepted) without regard to the question whether A. has sustained any loss by the negligence or not.

"(2) The drawer or maker is himself sometimes deceived by a forgery of his own signature, and it is held that he may correct the mistake provided it can be done without putting an innocent holder of the paper in a worse position than he would have been if the drawer or maker had discovered the forgery upon presentation of the instrument. Why should a bank be held to a stricter knowledge of the drawer's signature than the drawer himself? The maker of a note paying innocently upon his own forged signature may sue the person who received it; for money paid by mistake may be recovered, even though the payor was negligent, unless his negligence caused loss to an innocent party. The old cases would not hold the drawer to any diligence in discovery of the forgery of his name. He was not bound even to examine his accounts, as men of ordinary prudence are in the habit of doing; and, even if he told the bank that the signature was his, he could afterwards prove the forgery unless the bank expressed suspicions at the time it asked his opinion, and brought to his attention the fact that it might lose remedies over by his mistake in the matter, and such loss actually followed. The bank was bound to know the drawer's signature, 'because it must be presumed more familiar with it than the payee or holder,' and it was 'negligent in not making proper examination, which would have led to the discovery of the forgery'; therefore it was held to bear the loss. Now apply these reasons to the drawer, and it will be hard to see the consistency of releasing the drawer from all responsibility and putting the whole burden on the drawee, as the old cases did.

"(3) If a bank receives forged bills, purporting to be its own, it can, upon reasonably prompt discovery of the forgery, return them. Is it harder for the bank to know its own paper than that of its depositors, and is it less negligent in receiving forgeries of its

own name than in paying upon a forgery of someone out of a hundred or a thousand customers?

"(4) If a bank certifies a check by mistake, and notifies the holder at once, before he has transferred it to a bona fide holder, or lost any rights upon it, the certification is revoked, why does not the principle equally apply to payment?

"(5) If a check is paid through the clearing house, and the drawee discovers it has no funds, it may return the check, even after the hour set by the clearing house rules, if the payee bank has not lost its rights by the delay or altered its position, though, of course, the drawee bank will be liable for damages caused by violating the rules. If such recovery be allowed in case of mistake as to sufficiency of funds, much more should it be allowed in case of forged paper; for it may very well be argued in case of any payment good except for want of funds that it would save circuity of action to hold the drawee to the payment and give it no remedy except that against the drawer, instead of allowing it to sue the payee and the payee be referred to the drawer; and, if the drawer were solvent, this might do, though it is clear that it would be unjust to hold the bank in this manner if the drawer had become insolvent, and the bank had given notice of its mistake in time to save the holder all his rights and remedies just as if payment had been refused. But even this argument cannot be made in case of forgery, for (except in rare cases where the drawer acknowledges his signature or otherwise estops himself) the bank can have no right to charge the amount paid to the drawer.

"(6) Every transferrer of a chattel warrants title, and the actual existence of what he transfers, and this rule applies as well to bank bills, notes, checks, and coin as to the transfer of a horse. A counterfeit bill or forged check is nothing, the consideration of the contract fails utterly, as much as though a horse sold was a dead horse. Payment or deposit of such nothings raises no debt, and any money paid upon account of the transfer of nothing is paid without consideration. The party receiving the money had no right to demand it, and has no right to retain after receiving it, no matter now negligent the payor may have been, and he cannot acquire any right to keep the money except upon the following combination of facts: First, that the payee was not negligent; second, that the payor was lacking in due care; third, that upon faith of, the payor's action the payee has changed his position, or would be in a worse position if the mistake were corrected than if the payor had refused to pay or to accept at the time of presentment.

"(7) It must be borne in mind that we have been considering only cases where the drawee was really acting under a mistake and the drawer had not so conducted himself as to become liable upon the paper; for if the drawee knew the signature was forged, or if the drawer is liable and the drawee may therefore rightly charge him with the payment, the money cannot be recovered."

The quotation referred to is followed up by Mr. Morse by reference to and a discussion of what he terms "Transition Cases," and in section 466 he says: "To enable a holder to retain money paid to him on forged paper, he must put the bank alone in the negligence, and be able to say that the mistake of the bank 'cannot now be corrected without placing the holder in a worse position than though payment had been refused. If he cannot say this, and, especially if the failure to detect the forgery can be traced to his own disregard of duty in negligently omitting some precaution he had undertaken to perform, he fails to establish a superior equity to the money, and cannot with good conscience retain it.' If both parties are innocent equally, or both negligent equally, or the holder chiefly negligent, the bank may recover."

Applying the modern and what we regard as the sound rule to the facts of this case, we hold that the plaintiff was entitled to recover. Reduced to final analysis, the case is simply this: The plaintiff bank sent to the defendant bank a telegram merely saying that the plaintiff would pay W. T. Nichols' check for $200. The telegram did not indicate or intimate that the person who was then at Walnut Springs, claiming to be W. T. Nichols, was in fact that person; and the defendant had no right to construe the telegram as indicating that the plaintiff would pay a forged draft for $200. Therefore we hold that the defendant cannot claim to have been deceived or misled by anything done by the plaintiff. In due course of business, after the telegram was sent, the defendant caused a forged draft to be presented to the plaintiff, purporting to be signed by its customer, and, without discovering the forgery, the plaintiff paid the draft. True it is the plaintiff was guilty of negligence in not ascertaining the forgery before it paid the draft, but it does not appear that such negligence resulted in any injury to the defendant. In other words, the draft being a forgery, the defendant could not enforce its payment, and had no right to the money received from the plaintiff thereon, and, if compelled to refund it, will be in no worse condition than it was before it received the plaintiff's money. Such being the case, it is immaterial that the plaintiff was negligent, because it does not lie in the defendant's mouth to say to the plaintiff: "While I had no right to the money, I have a right to keep it because, if you had exercised proper care and diligence, I would not have obtained it." Such doctrine is unsound in law, is contrary to the plain principles of justice, and repugnant to the fundamental rules of equity. If

it should be held that title to property can be divested out of the owner merely by his negligence in permitting it to pass from his possession, a thief might acquire title to property which he had stolen from a negligent owner. Such doctrine cannot be sound.

Upon the whole case our conclusion is that no error has been shown and the judgment is affirmed.

Affirmed.